IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
ANDERSON DIVISION

Upstate Forever and Savannah Riverkeeper, )
                                          )
            Plaintiffs,                   )       C.A. No. 8:16-4003-HMH
                                          )
       vs.                                )
                                          )       **OPINION & ORDER**
Kinder Morgan Energy Partners, L.P. and   )
Plantation Pipe Line Company, Inc.,       )
                                          )
            Defendants.                   )

This matter is before the court on the Defendants' motion to dismiss the Plaintiffs' complaint. In their complaint, Plaintiffs Upstate Forever and Savannah Riverkeeper allege that Defendants Kinder Morgan Energy Partners, L.P. ("Kinder Morgan") and Plantation Pipe Line Company, Inc. ("PPL") have violated the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251-1376, through the unlawful discharge of gasoline, gasoline and petroleum substances, and other contaminants that have ultimately flowed into the waters of the United States.[1] The Defendants have moved to dismiss for failure to state a claim for relief pursuant to Rule 12(b)(6) and for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure. Further, the Defendants argue that the Plaintiffs' claims for injunctive relief should be dismissed based on primary jurisdiction abstention and Burford abstention.[2] After review, the court grants the Defendants' motion to dismiss.

---

[1]The Plaintiffs filed the instant case pursuant to the citizen suit provisions of the CWA set forth in 33 U.S.C. § 1365.

[2]Burford v. Sun Oil Co., 319 U.S. 315 (1943).

1

# I. FACTUAL AND PROCEDURAL BACKGROUND

This is an action arising out of a petroleum leak from PPL's pipeline on property owned by Eric and Scott Lewis, which is located in Anderson County, South Carolina near Belton, South Carolina (the "spill site"). (Compl. ¶ 1, ECF No. 1.); (Defs. Mem. Supp. Mot. Dismiss 1, ECF No. 14-1.) PPL owns the 3,100 mile pipeline that runs underground through the property. (Id. ¶¶ 3-4, ECF No. 1.) PPL is a subsidiary of Kinder Morgan. (Id. ¶ 4, ECF No. 1.) In December 2014, a leak caused by the failure of a patch over a dent was discovered on the pipeline on the property. (Id. ¶ 5, ECF No. 1.) The leak resulted in a discharge of an estimated 369,000 gallons of petroleum products. (Compl. ¶ 6, ECF No. 1.) The pipeline leak was repaired within a few days of discovering the leak and remediation efforts commenced. (Defs. Mem. Supp. Mot. Dismiss 3, ECF No. 14-1.)

South Carolina Department of Health and Environmental Control ("SCDHEC") is involved in the oversight and enforcement of remediation efforts. (Id., ECF No. 14-1.) To date, the Defendants have removed approximately 209,000 gallons of gasoline and petroleum products from the spill site. (Compl. ¶ 8, ECF No. 1.) However, it is undisputed that gasoline and petroleum products remain at the spill site and that remediation is ongoing. The Plaintiffs allege that the leak has resulted in the contamination of Browns Creek, Cupboard Creek, and two wetlands located in the vicinity of the spill. (Id. ¶ 11, ECF No. 1.)

The Defendants filed the instant motion to dismiss on February 17, 2017. (Mot. Dismiss, ECF No. 14.) The Plaintiffs responded in opposition on March 13, 2017. (Mem. Opp'n Mot. Dismiss, ECF No. 23.) The Defendants filed a reply on March 20, 2017. (Reply, ECF No. 24.) In addition, on March 7, 2017, the American Petroleum Institute ("API") and the

Association of Oil Pipe Lines ("AOPL") filed a motion for leave to file amici curiae brief in support of Defendants' motion to dismiss. (Mot. Leave File Amici Curiae, ECF No. 17.) The Plaintiffs responded in opposition to the motion for leave to file amici curiae brief on March 21, 2017. (Pls. Mem. Opp'n Mot. Leave, ECF No. 25.) AOPL filed a reply on March 27, 2017. (Reply, ECF No. 26.) The court granted API and AOPL's motion for leave on March 29, 2017. This matter is now ripe for consideration.

## II. DISCUSSION OF THE LAW

### A. Motion to Dismiss Standard

When presented with a Rule 12(b)(6) motion to dismiss, the court must restrict its inquiry to the sufficiency of the complaint rather than "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." Republican Party of N.C. v. Markley, 980 F.2d 943, 952 (4th Cir. 1992). In order to survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556).

### B. Rule 12(b)(1) Standard

In addition, pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, a party may move to dismiss a cause of action based on lack of subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). Challenges to jurisdiction under Rule 12(b)(1) can be raised in two different ways: facial attacks and factual attacks. Thigpen v. United States, 800 F.2d 393, 401 n.15 (4th Cir. 1986) (citing Adams v. Bain, 697 F.2d 1213, 1219 (4th Cir. 1982)), disagreed with on other

grounds, Sheridan v. United States, 487 U.S. 392 (1988). A facial attack questions the sufficiency of the complaint. Id. In this context, the court must accept the allegations in the complaint "as true, and materials outside the pleadings are not considered." Id. Alternatively, a factual attack challenges the factual allegations in the complaint upon which subject-matter jurisdiction is based. Id. In this situation, the court is required to consider evidence outside the pleadings as well, without converting the motion to a motion for summary judgment. Id.; Richmond, Fredericksburg & Potomac R.R. Co. v. United States, 945 F.2d 765, 768 (4th Cir. 1991). To prevent dismissal, "the nonmoving party must set forth specific facts beyond the pleadings to show that a genuine issue of material fact exists." Richmond, Fredericksburg & Potomac R.R. Co., 945 F.2d at 768. Thus, a dismissal should only be granted when "the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." Id.

### C. CWA

To establish a CWA violation, plaintiffs must show the discharge of a pollutant into navigable waters from any point source "except as authorized by a permit issued under the National Pollution Discharge Elimination System (NPDES) program." Assateague Coastkeeper v. Alan & Kristin Hudson Farm, 727 F. Supp. 2d 433, 435 (D. Md. 2010); 33 U.S.C. §§ 1311(a), 1342, 1362(12); Sierra Club v. El Paso Gold Mines, Inc., 421 F.3d 1133, 1142 (10th Cir. 2005) ("To establish a violation of these sections, a plaintiff must prove that the defendant (1) discharged (2) a pollutant (3) into navigable waters (4) from a point source (5) without a permit."). The Defendants raise a number of arguments in support of their position that this case must be dismissed for lack of jurisdiction and failure to state a claim because the discharge of

petroleum products from the pipeline is not ongoing and was not a discharge of pollutants into navigable waters from a point source.

### 1. Point Source

The Plaintiffs allege that the Defendants have violated the CWA by discharging pollution from a point source into navigable waters without a permit. (Compl. ¶ 64-66, ECF No. 1.) The Defendants contend that there was no requirement to possess a NPDES permit because there was and is no point source discharge of any pollutants into navigable waters. (Defs. Mem. Supp. Mot. Dismiss 11-14, ECF No. 14-1.)

> Congress passed the Clean Water Act in 1972 to restore and maintain the chemical, physical, and biological integrity of the Nation's waters. A central provision of the Act is its requirement that individuals, corporations, and governments secure National Pollutant Discharge Elimination System (NPDES) permits before discharging pollution from any point source into the navigable waters of the United States.

Decker v. Nw. Envtl. Def. Ctr., 133 S. Ct. 1326, 1331 (2013) (internal citations and quotation marks omitted). Pursuant to the CWA, "point source" means "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." 33 U.S.C. § 1362(14). "Discharge of a pollutant" means "any addition of any pollutant to navigable waters from any point source." § 1362(12). Under the CWA, navigable waters is "a defined term, and the definition is simply 'the waters of the United States.'" Rapanos v. United States, 547 U.S. 715, 730-31 (2006) (quoting 33 U.S.C. § 1362(7)). The Plaintiffs must allege more than merely identify a possible point source. The CWA requires that the Plaintiffs also allege that the point source actually added petroleum to navigable waters. See, e.g., Sierra Club v. BNSF Ry. Co.,

5

No. C13-967-JCC, 2016 WL 6217108, at *7 (W.D. Wash. Oct. 25, 2016) ("Based on the statutory language, Plaintiffs must do more than point to a statutorily defined point source to prove that there was actual addition of [petroleum] to the waters. They must also prove that there was a discharge to navigable waters.")

> Nonpoint source pollution is generally excluded from CWA regulations and is left to the states to regulate through their own tracking and targeting methods. The reason for this is, in part, because nationwide uniformity in controlling non-point source pollution [is] virtually impossible and, in part, because Congress is reluctant to allow extensive federal intrusion into areas of regulation that might implicate land and water uses in individual states.

Id. at *8 (internal citations and quotation marks omitted).[3] The CWA does not authorize a citizen suit for nonpoint source discharges. See, e.g., Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC, 794 F. Supp. 2d 602, 620 (D. Md. 2011) ("There is no basis for a citizen suit for nonpoint source discharges under the CWA."); see also Or. Nat. Res. Council v. U.S. Forest Serv., 834 F.2d 842, 849 (9th Cir. 1987) ("[W]e do not believe that the Act allows for the enforcement of state water quality standards, as affected by nonpoint sources, under the citizen suit provision.").

First, the Plaintiffs contend that "the pipeline is a point source because pollution released from it continues to make its way to waters of the United States." (Pls. Mem. Opp'n Mot. Dismiss 12, ECF No. 23.); (Compl. ¶ 62, ECF No. 1.) The Plaintiffs do not allege that the pipeline is presently leaking. It is undisputed that the underground pipeline leaked petroleum into the ground which has in turn led to contamination of the soil and groundwater. However,

---

[3]The CWA requires that the states implement a program for "controlling pollution added from nonpoint sources to the navigable waters within the State and improving the quality of such waters." 33 U.S.C. § 1329(b)(1).

6

the Plaintiffs must allege more than stating that pollutants ultimately may reach navigable waters.

The Plaintiffs are correct that a pipeline can be a point source. However, this is insufficient to state a claim for a CWA claim. The Plaintiffs must allege that the point source added pollutants to navigable waters. The Plaintiffs allege that "the area soaked with and contaminated by Defendants' leaked gasoline and petroleum products . . . and the seeps, flows, fissures, and channels are point sources that continue to discharge pollution into surface water and wetlands in violation of the Clean Water Act." (Id. ¶¶ 54-56, 62, ECF No. 1.) The Plaintiffs allege that the petroleum leaked into the groundwater and "[t]he groundwater contamination plume and the petroleum products have moved toward both streams and wetlands since the spill was first discovered, and they continue to move to the streams and wetlands." (Id. ¶ 16, ECF No. 1.) Further, the Plaintiffs allege that "[t]he gasoline that remains in the area of the spill is breaking down into the hazardous compounds that comprise gasoline–including benzene, toluene, ethylbenzene, xylenes, methyl tert-butyl ether ("MTBE"), naphthalene, and other contaminants–and making its way into groundwater supplies, wetlands, and surface waters in Anderson County and the Savannah River watershed." (Id. ¶ 10, ECF No. 1.)

It is undisputed that the leak from the underground pipeline discharge has contaminated the soil and groundwater at the spill site. However, in the case at bar, there is no continuing discharge from the pipeline and the Plaintiffs have failed to allege any facts to support the position that the pipeline discharged petroleum directly into navigable waters. Hamker v. Diamond Shamrock Chem. Co., 756 F.2d 392, 397 (5th Cir. 1985) ("No continuing addition to the ground water from a point source is alleged, nor could it be alleged under the facts set forth

in this complaint. Rather, the complaint alleges, necessarily, only that there are continuing *effects* from the past discharge, and such an allegation is insufficient for the purposes of section 1365."). The migration of pollutants through soil and groundwater is nonpoint source pollution that is not within the purview of the CWA. See, e.g., Tri-Realty Co. v. Ursinus Coll., Civil Action No. 11-5885, 2013 WL 6164092, at *8 (E.D. Pa. Nov. 21, 2013) (unpublished) ("Diffuse downgradient migration of pollutants on top of or through soil and groundwater . . . is nonpoint source pollution outside the purview of the CWA.").

In this case, the pipeline leaked petroleum into the ground and the contaminants are migrating through the soil and groundwater at the spill site. It is undisputed that the pipeline is no longer leaking. To find that the pipeline directly discharged pollutants into navigable waters under the facts alleged would result in the CWA applying to every discharge into the soil and groundwater no matter its location. All groundwater potentially flows downstream and will possibly at some point enter navigable waters. The Supreme Court in Rapanos found that the government's interpretation of the term "navigable waters" was overly broad and noted that "[t]he plain language of the [CWA] simply does not authorize [a] 'Land Is Waters' approach to federal jurisdiction." 547 U.S. at 734. The Plaintiffs' "Land is Waters" interpretation of the CWA is overly broad and untenable. Id. At best, with respect to the pipeline, the Plaintiffs have alleged a past discharge of pollutants into the soil and groundwater that may migrate into navigable waters, which is insufficient to state a plausible claim that the pipeline is a point source in this case or that the pipeline will discharge pollutants into navigable waters. Further,

8

as set forth more fully below, the pollution that allegedly may reach navigable waters is nonpoint source pollution.

In addition, the Plaintiffs allege that the spill site and the seeps, flows, and fissures from the spill site are point sources. In other words, the Plaintiffs contend that the pollutants on top of the ground are a point source, and the pollutants in the ground are a point source. Specifically, the Plaintiffs allege that point sources "need not be the original source of the pollutant; it need only convey the pollutant to navigable waters." S. Fla. Water Mgmt. Dist. v. Miccosukee Tribe of Indians, 541 U.S. 95, 105 (2004) (internal quotation marks omitted); (Pls. Mem. Opp'n Mot. Dismiss 23, ECF No. 23.). However, the conveyance must be "discernible, confined, and discrete." 33 U.S.C. § 1362(14). In South Florida Water Management, the Supreme Court cited examples of point sources in the CWA that did not generate pollution such as "ditches, tunnels, and conduits, objects that do not themselves generate pollutants but merely transport them," which are all discrete conveyances. Id.; Sierra Club v. Abston Constr. Co., 620 F.2d 41, 45 (5th Cir. 1980) ("Gravity flow, resulting in a discharge into a navigable body of water, may be part of a point source discharge if the miner at least initially collected or channeled the water and other materials. A point source of pollution may also be present where miners design spoil piles from discarded overburden such that, during periods of precipitation, erosion of spill pile walls results in discharges into a navigable body of water by means of ditches, gullies and similar conveyances, even if the miners have done nothing beyond the mere collection of rock and other materials. The ultimate question is whether pollutants were

discharged from 'discernable, confined, and discrete conveyance(s)' either by gravitational or nongravitational means.").

The facts of this case are distinguishable from the line of cases cited by the Plaintiffs involving "discernible, confined and discrete conveyance[s]" such as pits, holding ponds, cesspools, and coal plants. (Pls. Mem. Opp'n Mot. Dismiss 12, ECF No. 23 (citing Consolidation Coal Co. v. Costle, 604 F.2d 239, 249-50 (4th Cir. 1979)), rev'd, EPA v. Nat'l Crushed Stone Ass'n, 449 U.S. 64 (1980)). In Sierra Club v. Virginia Electric and Power Co., the district court found that coal ash piles were a point source because

> Dominion built the piles and ponds to concentrate coal ash, and its constituent pollutants, in one location. That one location channels and conveys arsenic directly into the groundwater and thence into the surface waters. Essentially, they are discrete mechanisms that convey pollutants from the old power plant to the river.

Civil Action No. 2:15-CV-112, 2017 WL 1095039, at *7 (E.D. Va. Mar. 23, 2017).

In the case at bar, there is no allegation that the Defendants have affirmatively undertaken any action to channel or direct contaminants to navigable waters and there is no discrete mechanism conveying the pollutants to navigable waters. To the contrary, the Defendants have undertaken efforts to remediate the spill site. The soil and ground water is contaminated and allegedly migrating toward navigable waters. As noted above, migration of pollutants through soil and groundwater is nonpoint source pollution. See, e.g., Chesapeake Bay Found., 794 F. Supp. 2d at 619-20 ("Discharge from migrations of groundwater or soil runoff is not point source pollution. . . ."); Sierra Club v. El Paso Gold Mines, Inc., 421 F.3d 1133, 1140 n.4 (10th Cir. 2005) ("Groundwater seepage that travels through fractured rock would be

nonpoint source pollution, which is not subject to NPDES permitting."); Nw. Envtl. Def. Ctr. v. Brown, 640 F.3d 1063, 1070 (9th Cir. 2011), rev'd on other grounds sub nom., Decker v. Nw. Envtl. Def. Ctr., 133 S. Ct. 1326 (2013) ("Stormwater that is not collected or channeled and then discharged, but rather runs off and dissipates in a natural and unimpeded manner, is not a discharge from a point source."); Friends of Santa Fe Cnty. v. LAC Minerals, Inc., 892 F. Supp. 1333, 1359 (D.N.M. 1995) (finding that seepage of pollutants in soil to groundwater was not a point source).

Further, the Plaintiffs fail to cite any legal authority to support their argument that remediation efforts that are ongoing at the spill site are a point source. (Pls. Mem. Opp'n Mot. Dismiss 13, ECF No. 23.) The Defendants are not collecting or storing pollutants at the spill site in any discrete conveyance. The Defendants' placement of recovery wells and remediation efforts undertaken under the oversight of the SCDHEC is not a discernable, confined, or discrete conveyance of pollutants to navigable waters subject to NDPES permitting requirements.[4] Moreover, to find otherwise, would discourage remediation of contamination.

Based on the foregoing, the spill site and the seeps, flows, and fissures from the spill site are not point sources because there are no factual allegations of a "discernible, confined and discrete conveyance" of pollutants to navigable waters. § 1362(14). The Plaintiffs have identified a discrete source for the pollution, but have failed to allege a discrete conveyance of

---

[4]Although SCDHEC has not commenced any civil or criminal action concerning the Defendants' spill, it has been and continues to be heavily involved in the oversight and approval of remediation efforts at the site. (Compl. ¶¶ 36, 37, ECF No. 1); (Pls. Mem. Opp'n Mot. Dismiss 4, ECF No. 23.)

pollutants into navigable waters. BNSF Ry., 2016 WL 6217108, at *8 (finding that coal discharge to land and from land to water from passing trains were not point source discharges). Thus, the Defendants' motion to dismiss is granted with respect to Plaintiffs' claim that the Defendants violated the CWA by discharging pollutants into navigable waters without a NDPES permit.

### 2. Hydrological Connection

Second, the Plaintiffs allege that the Defendants have violated the CWA by discharging pollutants into groundwater that is hydrologically connected to surface waters. (Compl. ¶¶ 67-70, ECF No. 1.)  The Plaintiffs do not appear to dispute that the CWA does not apply to groundwater alone. Rice v. Harken Exploration Co., 250 F.3d 264, 269 (5th Cir. 2001) ("The law in [the Fifth Circuit] is clear that ground waters are not protected waters under the CWA."). The CWA defines "navigable waters" simply as "waters of the United States." 33 U.S.C. § 1362(7).

> Congress refers to "navigable waters" and "ground waters" as separate concepts, thus indicating that Congress considered them to be distinct. Second, the legislative history of the CWA indicates that Congress chose not to regulate groundwater, in part because "the jurisdiction regarding groundwaters is so complex and varied from State to State."

Chevron U.S.A., Inc. v. Apex Oil Co., 113 F. Supp. 3d 807, 816 (D. Md. 2015) (citing 33 U.S.C. §§ 1252(a), 1254(a)(5), and 1256(e)(1) (referring to "navigable waters and ground waters"); S. Rep. No. 92-414 (1972), *as reprinted in* 1972 U.S.C.C.A.N. 3668, 3739).

The Plaintiffs contend that jurisdiction exists in this case because the CWA applies to pollutants that have flowed into surface waters through hydrologically connected groundwater.

District courts considering whether the CWA encompasses groundwater hydrologically connected to surface waters are split on this issue. Wash. Wilderness Coal. v. Hecla Mining Co., 870 F. Supp. 983, 990 (D. Wash. 1994) (citations omitted) (noting courts are split on the issue of whether tributary groundwater that is naturally connected to surface water is subject to CWA).

However, the two circuit courts to address this issue have concluded that navigable waters does not include groundwater that is hydrologically connected to surface waters. In Village of Oconomowoc Lake v. Dayton Hudson Corp., the Seventh Circuit held that the CWA does not apply to groundwater that is hydrologically connected to surface waters. 24 F.3d 962, 965 (7th Cir. 1994) ("The possibility of a hydrological connection cannot be denied, but neither the statute nor the regulations makes such a possibility a sufficient ground of regulation." (internal citations omitted)). In addition, the Fifth Circuit in Rice, held that "a generalized assertion that covered surface waters will eventually be affected by remote, gradual, natural seepage from the contaminated groundwater is insufficient to establish liability under the [Oil Pollution Act]," which utilizes "textually identical definitions of 'navigable waters'" as the CWA. 250 F.3d at 268-70, 272 (holding that "ground waters are not protected waters under the CWA" and noting that "the existing case law interpreting the CWA is a significant aid in our present task of interpreting the OPA").

The Fourth Circuit has not considered whether the CWA encompasses groundwater hydrologically connected to surface waters. Further, district courts within the Fourth Circuit are split on this issue. In Cape Fear River Watch, Inc. v. Duke Energy Progress, Inc., 25 F. Supp. 3d

798, 810 (E.D.N.C. 2014), the district court held that "Congress did not intend for the CWA to extend federal regulatory authority over groundwater, regardless of whether that groundwater is eventually or somehow 'hydrologically connected' to navigable surface waters." Further, in Chevron, the district court held "that Congress did not intend for groundwater to fall within the purview of 'navigable water,' even if it is hydrologically connected to a body of 'navigable water.'" 113 F. Supp. 3d at 817; But see Yadkin Riverkeeper, Inc. v. Duke Energy Carolinas, LLC, 141 F. Supp. 3d 428, 445 (M.D.N.C. 2015) (disagreeing with Cape Fear and finding that CWA jurisdiction extends to pollution of groundwater hydrologically connected to surface water); Ohio Valley Envtl. Coal. Inc. v. Pocahontas Land Corp., Civil Action No. 3:14-11333, 2015 WL 2144905, at *8 (S.D. W. Va. May 7, 2015) (unpublished); Sierra Club v. Va. Elec. & Power Co., 145 F. Supp. 3d 601, 607 (E.D. Va. 2015); Sierra Club v. Va. Elec. & Power Co., Civil Action No. 2:15-CV-112, 2017 WL 1095039, at *6 (E.D. Va. Mar. 23, 2017).[5]

---

[5] District courts in other circuits have also split on this issue. See, e.g., Umatilla Waterquality Protective Ass'n, Inc. v. Smith Frozen Foods, Inc., 962 F. Supp. 1312, 1320 (D. Or. 1997) (holding "that discharges of pollutants into groundwater are not subject to the CWA's NPDES permit requirement even if that groundwater is hydrologically connected to surface water"); Cooper Indus., Inc. v. Abbott Labs., No. 93-0193, 1995 WL 17079612, at *4 (W.D. Mich. May 5, 1995) (unpublished) (same); But see Hawai'I Wildlife Fund v. Cty. of Maui, 24 F. Supp. 3d 980, 996 (D. Haw. 2014) (holding that "[i]t is the migration of the pollutant into navigable-in-fact water that brings groundwater under the [CWA]"); Hernandez v. Esso Standard Oil Co. (P.R.), 599 F. Supp. 2d 175, 181 (D.P.R. 2009) (holding that "the CWA extends federal jurisdiction over groundwater that is hydrologically connected to surface waters that are themselves waters of the United States"); Idaho Rural Council v. Bosma, 143 F. Supp. 2d 1169, 1180 (D. Idaho 2001) (same); Williams Pipe Line Co. v. Bayer Corp., 964 F. Supp. 1300, 1319 (S.D. Iowa 1997) (same); Ass'n Concerned Over Res. & Nature, Inc. v. Tenn. Aluminum Processors, Inc., No. 1:10-00084, 2011 WL 1357690, at *17 (M.D. Tenn. Apr. 11, 2011) (unpublished) (same); Nw. Envtl Def. Ctr. v. Grabhorn, Inc., No. CV-08-548-ST, 2009 WL 3672895, at *11 (D. Or. Oct. 30, 2009) (finding that CWA covers discharges to navigable surface waters via hydrologically connected groundwater) (unpublished); Mut. Life Ins. Co. v.

14

The court agrees with the analysis in Cape Fear and Chevron and finds that a narrower interpretation of "navigable waters" is more persuasive.  The statutory language supports this conclusion given that "navigable waters" and "ground waters" are separate and distinct concepts in the CWA.  Further, as the court noted in Chevron,

> this narrower interpretation of "navigable waters" is supported by the Supreme Court ruling in *Rapanos v. United States*. . . .  There, the Court considered what standard to apply in order to determine if certain *wetlands* constitute "navigable waters" under the CWA.  In setting forth tests that excluded some wetlands from the scope of the CWA, the Supreme Court eschewed a broad interpretation of navigable waters and repeatedly cautioned against "attempting to expand the definition of navigable waters to encompass virtually all water, regardless of its actual navigability, location, or consistency of flow."

113 F. Supp. 3d at 817 (quoting Cape Fear, 25 F. Supp. 3d at 809, and citing Rapanos, 547 U.S. 715, 733-34 (2006)).

The allegations in the Plaintiffs' complaint are factually similar to the allegations in Chevron,[6] involving a petroleum spill from an underground pipeline that contaminated the groundwater and migrated toward surface waters.  113 F. Supp. 3d at 816.  In the instant complaint, the Plaintiffs allege that "the gasoline that remains in the area of the spill is breaking down into the hazardous compounds that comprise gasoline . . . and making its way into groundwater supplies, wetlands, and surface waters in Anderson County and the Savannah River watershed."  (Compl. ¶ 10, ECF No. 1.)  Further, the Plaintiffs allege that the "Defendants'

---

Mobil Corp., No. CIVA96CV1781RSP/DNH, 1998 WL 160820, at *3 (N.D.N.Y. Mar. 31, 1998) (same).

[6] Although Chevron involved violations of the Oil Pollution Act as opposed to the CWA, as discussed previously, the Oil Pollution Act and the CWA utilize identical definitions of navigable waters and the court relied heavily on CWA cases.

pipeline and the Spill Site are contaminating groundwater, which is closely hyrdrologically connected to the surface water and the wetlands and which is conveying Defendants' petroleum pollution to the surface water and wetlands." (Id. ¶ 56, ECF No. 1.) The Plaintiffs contend that there are two streams and two wetlands located near the spill site and that "[t]hese water bodies are located in the path of groundwater flow from the spill site." (Id. ¶ 11, ECF No. 1.) In addition, the Plaintiffs submit that "[t]he groundwater contamination plume and the petroleum products have moved toward both streams and wetlands since the spill was first discovered, and they continue to move to the streams and wetlands." (Id. ¶ 16, ECF No. 1.) Further, the Plaintiffs allege that petroleum and petroleum products have been detected in Browns Creek. (Id. ¶ 17, ECF No. 1.) The complaint only alleges that petroleum leaked from the pipeline into the groundwater at the spill site is slowly migrating toward two creeks and two wetlands. As set forth above, the CWA does not apply to claims involving discharge of pollution to groundwater that is hydrologically connected to surface waters. As such, subject matter jurisdiction does not exist over Plaintiffs' CWA claim based on hydrological connection between groundwater and surface water.

For the reasons set forth above, the Plaintiffs' complaint is dismissed pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.[7]

---

[7]Having found that the Plaintiffs' claims are subject to dismissal, the court declines to address the Defendants' remaining arguments.

It is therefore

**ORDERED** that the Defendants' motion to dismiss, docket number 14, is granted.

**IT IS SO ORDERED.**

                                            s/Henry M. Herlong, Jr.
                                            Senior United States District Judge

Greenville, South Carolina
April 20, 2017